# Exhibit 1

Thomas W. Stoever, Jr. (Cal. Bar No. 150056)
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
Telephone: (303) 863-1000
Facsimile: (303) 832-0428
thomas.stoever@aporter.com

Attorney for Proposed Intervenor-Defendant
Reckitt Benckiser Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **Center for Biological Diversity,** a non-profit organization,<br><br>              Plaintiff,<br><br>v.<br><br>**Environmental Protection Agency**, and **Stephen Johnson**, Administrator, U.S. EPA<br><br>              Defendants. | Case No. 07-cv-02794-JCS<br><br>**DECLARATION OF NEIL K. SNYDER IN SUPPORT OF RECKITT BENCKISER INC'S MOTION TO INTERVENE** |

I, Neil K. Snyder declare as follows:

1. I am the Director of Research and Development for the Global Regulatory, Safety & Environmental Services division of Reckitt Benckiser Inc. ('Reckitt"). In my capacity as Director, I have responsibility for product safety and stewardship at Reckitt.

2. My entire professional career has been devoted to the fields of toxicology and immunotoxicology. As explained more fully below, I have graduate degrees in toxicology and immunotoxicology and have worked as a scientist for over twenty-five years. During that time I have published multiple articles on toxicology, immunotoxicology, and teratology in peer-reviewed scientific journals and have been invited to speak at various professional conferences on toxicology-related issues.

3. I graduated in 1976 from Johns Hopkins University with a Bachelor of Arts degree in Biology. In 1979, I graduated from the University of Texas with a Masters of Science degree in Environmental Sciences and Toxicology. After working as a toxicologist for several years, I pursued further graduate work at Virginia Commonwealth University, where in 1993 I graduated with a Ph.D. in Pharmacology/Toxicology and Immunotoxicology.

4. After obtaining my Masters degree, I took a job in 1980 as a toxicologist at the American Petroleum Institute. In 1982, I left the Institute and went to work for the Atlantic Richfield Company (ARCO), also as a toxicologist. In 1991, while working on my Ph.D. in Virginia, I took a job as Product Stewardship Manager for Albright & Wilson Americas, Inc. Following the award of my Ph.D., I left Albright and went to work as a scientist for the Proctor and Gamble Company in 1994, where I remained until the time that I came to work for Reckitt.

5. In 1996, I began working at Reckitt & Colman Inc., a predecessor of Reckitt Benckiser Inc. My position was Group Leader in the Product Safety division. In 1997, I was promoted to Senior Manager in the Product Safety division. In 1999, I was again promoted, this time to the position of Director of the Health, Environmental & Regulatory Affairs division. After Reckitt & Colman merged with Benckiser N.V. in 1999 to become Reckitt Benckiser Inc., I was promoted to my current position as Director of Research and Development in the Global Regulatory, Safety & Environmental Services division.

6. I have personal knowledge of the matters referred to herein and if called upon to testify, could and would testify truthfully thereto.

### Reckitt's Registrations

7. Reckitt holds end use product registrations for rodenticide products that contain either of two of the forty-eight pesticide active ingredients at issue in this lawsuit. These products contain brodifacoum or warfarin. Reckitt similarly holds an end use registration for difethialone, which also is mentioned in Plaintiff's complaint in conjunction with the nine rodenticides that the U.S. Environmental Protection Agency ("EPA") historically has considered in combination when making policy. Compl. at ¶ 129. Furthermore, Reckitt is engaged in the development of future products that may contain other rodenticides at issue in this lawsuit.

8. Reckitt or its predecessors have been formulators of warfarin and/or brodifacoum containing products for over fifty years. Reckitt or its predecessors have been authorized or licensed to use warfarin for over fifty years and brodifacoum for over twenty years.

9. These products provide many benefits and have been relied upon by residential consumers/users for use in their homes.

### Reckitt Would Be Harmed By An Injunction Prohibiting Use Of Its Rodenticides

10. Plaintiff's claim in this case raises the possibility that the sale and use of rodenticides containing the active ingredients listed in the complaint, some of which have been on the market for fifty years or more, could be enjoined. In addition to destroying the value of Reckitt's investment in studies to establish the safety of these rodenticides, the injunctive relief that Plaintiffs seek, if successful, will have direct, immediate, and harmful effects upon Reckitt's business, including on Reckitt's ability to market and sell products in the San Francisco Bay Area ("Bay Area") and throughout the United States.

11. Reckitt has invested significant resources to develop, obtain, and maintain the registrations of these rodenticides, including to prove the safety of its products to humans and the environment. All pesticides (including the rodenticides at issue here) that initially were registered prior to 1984 are subject to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") reregistration requirements, a process by which EPA is reviewing older pesticides under FIFRA to ensure that they meet current scientific and regulatory standards. Reckitt has expended substantial resources toward reregistration of the rodenticides at issue in this lawsuit.

12. During the initial registration and the subsequent reregistration of pesticide products, EPA evaluates whether the pesticide might pose a risk to any non-target organism, including any listed endangered species, in all areas of the U.S. where the product is authorized for use. During the registration and reregistration processes, Reckitt conducted a thorough testing program and submitted to EPA all required technical information including scientific studies on the safety and effectiveness of its rodenticides. These included an assessment of potential risks to non-target organisms.

13. Over the years, Reckitt has invested in the research and testing of its products to provide assurance of their safety for use in the control of rodents in the home, including their safety to the environment. The injunctive relief sought in this lawsuit threatens the substantial investment that Reckitt has made to ensure the safety of these rodenticides to the satisfaction of the regulatory authorities. The injunctive relief Plaintiffs seek has the potential of destroying the value of Reckitt's investment in these studies, which totals approximately $1,000,000.

14. Reckitt invests approximately $100,000 annually to maintain its registrations at issue in this case. The injunctive relief sought by Plaintiffs would destroy the value of this investment.

15. The registration is of even greater value to Reckitt in terms of future sales. Reckitt stands to lose many tens of millions of dollars in direct sales annually as a result of the restrictions on the rodenticides requested by Plaintiff.

16. Plaintiff's claim in this case includes a request that EPA be enjoined from authorizing uses of the identified pesticides in the San Francisco Bay watershed. Such an injunction has the possibility of eliminating Reckitt's ability to sell its d-CON® brand of products within the Bay Area, causing Reckitt substantial monetary losses.

17. The losses Reckitt would experience from such an injunction would not be limited to the loss of sales within the Bay Area alone. Because Reckitt cannot control the supply chain with the specificity needed to limit sales just in the Bay Area, such an injunction would have the effect of preventing sales of Reckitt's products throughout the state and possibly surrounding states. Reckitt estimates that consumers spend approximately $4 million annually on the rodenticides at issue in California alone.

18. Although the requested injunction is limited to the Bay Area, it would impact sales on a national level as well. Plaintiff requests a change in EPA's policies regarding registrations and reregistrations. Such a change would affect Reckitt's registrations for existing

and future products. Reckitt estimates that consumers spend tens of millions annually on its d-CON® brand of rodenticides in the United States.

19. The potential impact of the lawsuit also reaches beyond the chemicals listed in Plaintiff's complaint. To the extent EPA's policies with regard to rodenticides changes, such a shift in policy would likely be applied globally to all rodenticide registrations in the United States. This may diminish the value of research, product development and testing already done by Reckitt and increase costs in the future.

20. Reckitt is in the process of developing new products, some of which utilize active ingredients that are directly at issue in this lawsuit. Reckitt has invested over $2 million in developing its future product line.

21. An injunction and limitation on use would affect Reckitt's position in the market and harm the company's ability to effectively market rodenticides in the United States. If consumers were unable to use these rodenticides, they would be forced to switch to alternative products, many of which are produced by other companies, depriving Reckitt of a market for its products. Thus, an injunction would directly undermine the value of the asset of the d-CON® brand to the company, which is worth millions of dollars.

I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, belief, and understanding..

Executed on this _27_ day of _September_, 2007.

_____
Neil K. Snyder